## Young vs. Miles and another.

*Replevin for plaintiff's share of grain stored in mass. — Evidence.*

1. Plaintiff being the owner of a certain quantity of wheat, which, with his consent, was stored in mass with that of others in a warehouse, after shipments had been made from the mass until a quantity not greater than that due him was left in the warehouse, this was his absolute prop-erty as against the warehouseman.
2. A subsequent sale of the wheat by the warehouseman was a wrongful con-version, and plaintiff might follow it wherever it could be identified.

3. At the time of the separation, one B. had a claim upon the warehouseman for wheat stored by him in said warehouse, but after such separation, and before the sale to defendants, sold the same to the warehouseman. *Held*, that these facts do not affect plaintiff's rights as against said warehouseman or the defendants.

4. Admissibility of certain books of account in evidence, considered.

APPEAL from the Circuit Court for *Milwaukee* County.*

Replevin, for wheat. In 1863 and 1864, one Wm. H. Robinson was employed to buy wheat for the plaintiff, to be stored in his (Robinson's) warehouse in Wabasha, Minn., the agreement being that it might be stored with other grain of the same quality by inspection, received about the same time for other owners. From the 26th of January, 1864, down to the commencement of this action, plaintiff held a warehouse receipt from Robinson, of the former date, for 4,168 bushels No. 1 spring wheat, on which were indorsed receipts as follows: July 5, 1864, 1,216 bushels; July 8, 1864, 1,409 bushels. After said January 26th, Robinson purchased for himself, and stored in said warehouse, some 2,000 bushels of wheat, and large quantities for other parties, including the plaintiff, all of which was stored in a common mass, and shipments made therefrom at different times to various parties. He did not buy any wheat for the defendants. On the 10th of June, 1864, he telegraphed to them to sell 4,000 bushels, to be delivered to them at Milwaukee during that month; and on the next day wrote to them as follows: "I shall ship wheat to apply on the 4,000 bushels, as soon as I can get a barge. I expect to start east the forepart of next week, and while gone leave my business with Mr. Crawford; please pay his drafts the same as you would mine. I gave draft to-day for $175.17; shall have to draw about Wednesday for $1,411.09; will try to have the wheat on before the draft is presented; if not,

_____

* The decision of this court on a former appeal in this cause will be found in 20 Wis. 615-25.

please take care of it, as the wheat will soon be in." On the 13th of the same month he left Wabasha for the east, and was gone six or seven weeks, leaving his business in the hands of his brother, and of his bookkeeper, J. C. Crawford; giving his brother "no particular power," but authorizing Mr. Crawford to draw drafts and attend to his general correspondence. He testifies that when he left, there were four or five thousand bushels of wheat in the warehouse; that he supposed there was more than enough to fill all outstanding receipts, but, as it turned out, there were a few bushels short; that he instructed his agents to ship wheat to Nichols & Co., of Chicago, and to the defendants. On the 20th, Crawford drew on the defendants, in Robinson's name, for $1,411.10, in favor of J. D. Blake & Co., of Rochester. This draft was never accepted or paid. *Mr. Miles*, however, one of the defendants, testifies that they paid on account of said 4,000 bushels, which they were thus authorized to sell short, some $2,500 or $2,600. Only about 225 bushels of wheat was received at Robinson's warehouse at Wabasha between the 8th of June and the 7th of July; and this was on his own account. On the 7th of July, 1864, defendants (as *Mr. Miles* testifies) received from Robinson, consigned to them from Wabasha, over the St. Paul and La Crosse railroad, by cars numbered 278, 836, 996 and 1,002, wheat amounting to 1,435 bushels, and which was on account of the 4,000 bushels above mentioned. On the same day plaintiff notified them that he claimed said wheat, as owner; and on the next day he made formal demand thereof.

As to the ownership of the wheat in Robinson's warehouse between June 7th or 8th and July 5th or 6th, the evidence was as follows: Mr. Robinson testified, that in June he had in his possession there about 13,700 bushels of wheat belonging to the plaintiff; that this was all he then had in store at Wabasha, or at least all that was on the lower floor; that on the 7th or 8th of that month, he had a conversation in the warehouse with

J. S. Nichols, the plaintiff's agent; that he pointed out said wheat to Nichols as plaintiff's property, and requested him to ship it, as he (Robinson) wished to go east, and Nichols promised to furnish a barge for that purpose; that on the 1st of said month he had in his said warehouse, in bulk, 4,665 bushels of wheat belonging to one Blake; that on that day he shipped to certain parties in Chicago 3,204 bushels of said wheat; that he shipped the balance of Blake's wheat to the plaintiff, at Milwaukee, on the 7th of that month, on account of the bin in which it was placed bursting; and that after it was shipped he purchased it of Blake. Mr. Nichols testifies in the same manner as to what occurred on the 7th or 8th of June, and also that, having failed to get barges to remove it, he found apparently the same wheat in the same situation on the 22d of June, and the clerk assured him it was the same. Mr. Blake (for the defendants) testified: "On the 11th of June, 1864, I had remaining in Robinson's warehouse at Wabasha, 1,461 bushels of wheat, deposited there during the previous winter and spring. On that day, Robinson called on me at my place of business in Rochester, and offered to buy said wheat at $1,505. I replied that if he would place that amount, less the balance due him on account of storage, etc. (say $94.32, leaving a balance of $1,411.10), to my credit at once with my correspondents in Milwaukee, Messrs. L. F. Hodges & Co., he could have the wheat. Upon which statement he left me. I had no knowledge of the acceptance of my terms, till I received his draft on *Miles & Armour* for $1,411.10, dated June 20th.(?) On sending forward this delayed draft to Messrs. L. F. Hodges & Co., it was delayed there some days, with advices of partial promises of payment, when it was returned to me on or about the 2d of July, 1864. Going to Wabasha immediately to examine the matter, I found that Robinson's property had been attached, and my wheat shipped; and up to this time I have not received my pay for the wheat or the draft."

The evidence that the wheat received by defendants on the 7th of July, was part of what had been in Robinson's warehouse at Wabasha a few days before, was as follows: L. J. Higby, for the plaintiff, said that in July, 1864, he was engaged (as one of the firm of L. J. Higby & Son) in the storage business at the depot of the La Crosse and Milwaukee railroad, in Milwaukee; he had charge of all the goods (including grain) that came down on the railroad, took care of them, and delivered them to the owners; they had also an elevator there, which witness personally superintended; they kept books for the railroad company, and also kept books for themselves; wheat coming by the road from Wabasha, or other points above La Crosse, would be shipped on a barge to La Crosse, then unloaded into the elevator, each consignment by itself, thence put on cars and started for Milwaukee, a bill of lading being made out at the La Crosse elevator, which the conductor would bring along probably on the same train, and deposit at the freight office; these bills were copied into the "Freight Receiving Book;" a bill of the charges was made out for the owner, and when he came and paid the charges, he took the bill of lading which he drew at the freight office, and presented it at the office of L. J. Higby & Co., and drew the wheat which the numbers of the cars called for; the grain goes into store [in the elevator] from the cars, after being weighed, and a memorandum is sent to the office, and the weight of the wheat set opposite on the book to the number of the car. Each man has an account there [at the elevator] of the wheat he has there, and has the wheat in store put to his credit, and he gets a warehouse receipt showing so many bushels to his credit; and if he wants to draw out any, he makes an order for the number of bushels he wants, and it is delivered, and that order is charged to him, or against his wheat. The witness further stated that he had with him in court the books above mentioned, that the same were accurate, and the entries

therein referring to wheat received for and delivered to the defendants were made according to the established and usual mode of business between L. J. Higby & Son and the railroad company; and it appears from these books that wheat was received at the elevator on the 7th of July, 1864, purporting to come from Wabasha, from W. H. Robinson, by the barge "Federal Union," consigned to *Miles & Armour.* Witness further testified that said wheat was delivered to defendants. On cross-examination, he said that the cars by which said wheat arrived were numbered 278, 836, 996 and 1,002; that all the testimony he had given, except as to the customary mode of doing business, was from said books; * that the entries in one of said books (viz., the "Freight Receiving Book" in the railroad office) were not in his handwriting, and that he did not see them made; that he had referred to this book in his testimony for the numbers of the cars; that in the other book (viz., L. J. Higby & Son's account book with owners of grain stored in the elevator), the entries in account with defendants, which specified the numbers of the cars above stated, the number of bushels in each, etc., were not in his handwriting, and he did not see them made, but he thought they were in the handwriting of one Courtney; that he had present the warehouse receipts issued by L. J. Higby & Son to defendants, covering the wheat in question, and which had been surrendered by defendants on delivery of the wheat; that the numbers of the cars on which the grain arrived were not mentioned on these receipts.

*Question.* "How do you know that these receipts covered the grain received by those particular cars?" *Answer.* "I know because the defendants called for the wheat just as it

---

* The account book of L. J. Higby & Son did not show from what barge or other vessel the wheat was transshipped at La Crosse, but that appeared only from the railroad company's "Freight Receiving Book."

came in.   If it comes in to-day, they will be there after it to-night or in the morning."

The defendant *Miles*, as a witness for plaintiff, testified that he received wheat upon a warehouse receipt from Mr. Robinson, and the shipment of which was procured from Mr. Robinson's warehouse; and also that on or about the 7th or 8th of July, he received wheat from Higby's elevator, but whether the wheat mentioned in said receipt and that received from Higby were identical, he did not know; that he got a notice from the plaintiff that he claimed the wheat received by the cars numbered 278, 836, 996 and 1,002, and he (witness) had remarked at the time that if plaintiff proved the same to be his property, he could have it.

Theron Higby, of the firm of L. J. Higby & Son, for the plaintiff, testified that the entries in L. J. Higby & Son's account book above mentioned, under date July 7, showing the receipt of wheat on that day consigned to *Miles & Armour*, by the four cars numbered 278, 836, 996 and 1,002, were in his (witness') handwriting; that receipts for said wheat were given to *Miles & Armour*, which receipts ·(being the same above mentioned) were shown to the witness and identified by him.   On cross-examination, he said that the entries "were taken from the slip that was sent from the railroad company, or delivery check from the railroad company, or the freight bill," and that all his knowledge of the facts was derived from that source.   Being asked how he knew that the warehouse receipts issued to defendants were for the grain received by the four cars in question, he answered in substance, that he knew it from the agreement as to the date and amounts between said receipts and the entries as to said cars.

The defendants moved to exclude the testimony given in relation to the books above mentioned, and the books themselves, and the testimony of L. J. Higby; but the motion was denied.   The remainder of the testimony need not be stated.

The defendants asked the court to instruct the jury, that if Blake, on the 1st of June, 1864, owned over 4,000 bushels of the wheat then in Robinson's warehouse, and if Robinson, on or about that day, shipped about 1,461 bushels of said wheat to the plaintiff, then, as between Blake and the plaintiff, that amount of the wheat still in store at said warehouse belonged to Blake; and if after said shipment there did not remain in said warehouse any more wheat to satisfy Blake's claim than the amount so shipped to plaintiff, the wheat so remaining belonged to Blake, and Robinson could not destroy his title thereto without his knowledge and consent. This and several similar instructions requested by the defendants, were refused, and the court withdrew from the consideration of the jury the claim that Blake owned any part of the wheat in question.

Verdict for the plaintiff; new trial denied; and defendants appealed from a judgment on the verdict.

*Finches, Lynde & Miller*, for appellants:

1. The entries in the books of L. J. Higby & Son were not competent evidence. It requires the entries in the "Freight Receiving Book" of the railroad company, as well as those in Higby's account book, to identify the wheat received by cars 278, 836, etc., with that which came down the river from Wabasha on the barge "Federal Union." But these entries are not proven correct by the person who made them, nor by any person who now has, or had at the time they were made, personal knowledge of the facts. No employee of the railroad company was called to testify to the "general accuracy of the book." The testimony to that subject was by one who did not make the entries, was not present when they were made, had no personal knowledge of the facts, and had no duty to perform in connection with the book. See *Young v. Miles*, 20 Wis. 615; 15 N. Y. 485; 17 id. 134; 22 id. 462; 29 id. 351. The person who made the entries, if living, should have been called. 16 Wend. 595; 6 Cow. 162; 2 Hill, 537; 5 Porter

(Ala.), 107; 1 Haywood (N. C.), 458; 2 id. 24.  2. Even if it should be conceded that Robinson, on the 12th of June, 1864, became the owner, by purchase from Blake, of all the wheat to which the latter was entitled, still the plaintiff could acquire no title to the wheat thus purchased, by virtue of a warehouse receipt given to him in January, or by virtue of any thing done by Robinson on the 7th or 8th of June.  There is no evidence that Robinson, *after* the pretended purchase from Blake, did any act to transfer the title of the wheat to *Young*.  Counsel further contended, from the evidence, that there was no completed sale of the grain by Blake to Robinson.

*Emmons & Van Dyke*, for respondent.

COLE, J.  We are by no means clear that the books of Higby were incompetent evidence under the circumstances.  The general accuracy of the books was fully proven, and the course of business in receiving freight for the cars.  And T. Higby says he made the entries of the wheat received by the cars numbered 278, 1,002, 836 and 996, according to the account sent from the railroad company.  He explains fully the method of doing business between the firm of Higby & Son and the railroad company, and shows how they ascertained the amount of wheat delivered and the car by which it was received.  But we shall not dwell upon this point.  For even assuming that the books were not admissible, we agree with the counsel for the plaintiff in the opinion that there was more than sufficient evidence in the case, from other and clearly competent sources, to warrant and sustain the finding of the jury.  Of course, the object of introducing the books in evidence was to identify the wheat received by the defendants with that set apart by Robinson in his warehouse, for the plaintiff, on the 8th of June, 1864.  But aside from the books, we think the other evidence fully establishes the fact that this wheat came to the possession of the defendants, and that the jury must have so found from that

testimony.  It was certainly very easy for the defendants to show where the wheat in dispute came from, if it was not this identical wheat.  *Miles'* own testimony strongly tends to show that the wheat set apart by Robinson in his warehouse at Wabasha for the plaintiff came to their possession, and the fact was quite clearly established by the other testimony in the cause.  The jury, therefore, were fully warranted in finding that this identical wheat had come to their possession, aside from any thing contained in the books.  So that, even if these books were not competent, the defendants could not have been prejudiced by their admission in evidence.

It is insisted that the court erred in refusing to instruct the jury as requested in regard to the wheat owned by Blake.  It appeared from the evidence, that on the 1st of June, 1864, Robinson had in his warehouse in bulk at Wabasha 4,665 bushels of wheat belonging to Blake.  This wheat was received during the preceding winter, and up to the last of May, 1864.  On the 1st of June, Robinson shipped to a firm in Chicago 3,204 bushels of this wheat, for Blake.  The balance of Blake's wheat he shipped to the plaintiff on the 7th of June, 1864.  After it was shipped, Robinson purchased this wheat of Blake.  This purchase was made about the 12th of June.  Now it is claimed that Blake was interested in the wheat which Robinson set apart for the plaintiff on the 8th of June, and therefore that the plaintiff's title fails.  But it seems to us that this is a mistake.  What would be the consequence of this separation, providing Robinson had not afterward become the owner of Blake's wheat by purchase, we need not determine.  It is sufficient to say that Robinson afterward acquired Blake's title.  Consequently we think the court properly withdrew from the consideration of the jury all the defense founded upon Blake's ownership of the wheat.  For, as already remarked, what would have been his rights if he had not sold, and whether he could not have claimed the entire quantity of wheat in store

on the 8th of June, the admixture having been made without his consent, are questions which are not in the case. He saw fit to part with his title to Robinson, and has no further interest in the property. And although Robinson did not own all the wheat in his warehouse which he set aside for the plaintiff, yet, as he subsequently acquired the title, that title, immediately upon its acquisition, became vested in the plaintiff. It is said that the evidence shows that the sale by Blake to Robinson was not absolute, but in the nature of an agreement to sell. But this is not a fair inference even from the testimony of Blake himself; while Robinson says unqualifiedly that he purchased Blake's wheat on the 12th of June. And he says that he purchased because he had shipped it without his consent or knowledge.

We do not deem it necessary to go over all the points so ably discussed by the counsel for the defendants in his brief. The plaintiff's right to maintain the action of replevin for the wheat which has come into the possession of the defendants, was affirmed when the case was before us on a former appeal. 20 Wis. 615. On the second trial, the court, in a very clear charge, submitted the questions of fact to the jury arising upon the evidence; and we are entirely satisfied with the result.

*By the Court.*—The judgment of the circuit court is affirmed.

A motion for a rehearing was denied.