## Case No. 11,532.

### RAHILLY v. WILSON.

[3 Dill. 420; [1] 1 Cent. Law J. 80.]

Circuit Court, D. Minnesota. Dec., 1873.[2]

WAREHOUSE GRAIN RECEIPTS — SALE — BAILMENT.

Where grain is stored in an elevator warehouse with the understanding implied from the known and invariable course of business, that it may be sold by the warehouseman, and that when the depositor shall be ready to surrender the receipt of the warehouseman therefor, the latter will give the highest market price or the same amount of grain of the like quality, but not the identical grain deposited, nor grain from any specific mass, the transaction is a sale and not a bailment. Criteria of sales and bailments stated.

[Cited in McCabe v. McKinstry, Case No. 8,-667; The Pietro G., 38 Fed. 150.]

[Cited in Barnes v. McCrea, 75 Iowa. 271. 39 N. W. 394; Fishback v. Van Dusen, 33 Minn. 123, 22 N. W. 249.]

This is an appeal in bankruptcy from the decree of the district court, granting the relief prayed in the original bill of Patrick Rahilly, filed for himself and the other warehouse grain receipt holders, and dismissing the cross bill of the First National Bank of St. Paul. The suit was brought in the district court to settle the title to twenty-one thousand five hundred bushels of wheat, or its representative in money, now lying in the registry of that court. George Atkinson & Co. and their successors, Atkinson & Kellogg, were engaged at Lake City as ware-

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]
[2] [Affirming in part Case No. 11,531.]

housemen and commission and forwarding merchants, during the fall of 1868, and up to December 8th, 1870, when they filed their petition in bankruptcy, and were adjudicated bankrupts. The firm of George Atkinson & Co. was composed of George Atkinson alone, until April 1st, 1870, when Kellogg became a partner. The old name was used until September, and was then changed to Atkinson & Kellogg, and so continued until their failure, at which time they had in their warehouse the wheat in controversy, which was taken possession of by [Wilford L. Wilson], the assignee in bankruptcy. At the date of their bankruptcy, they had outstanding warehouse receipts issued to farmers to the amount of about thirty-five thousand bushels, representing Nos. 1 and 2 grades of wheat, and two receipts dated November 23, 1870, to the amount of twelve thousand bushels, issued as collateral security for the payment of three drafts given to pay an overdrawn bank account with their bankers, to the amount of ten thousand dollars. These two receipts were issued to the drawee named in the drafts, and they had been endorsed over to their bankers. They represented twelve thousand bushels of wheat, and are now held by the First National Bank of St. Paul, having come into its possession in the course of a transaction which will hereafter be mentioned. The complainant, a farmer, to whom some of these receipts had been issued, in behalf of himself, and the others, holding receipts to the amount of thirty-five thousand bushels, filed this bill against the assignee, and seeks to appropriate the fund exclusively to the payment of their receipts. The bank, by stipulation, is made a party defendant, has answered the bill, and also filed a cross bill, alleging that it has to the extent of its claim, a prior right to payment out of the fund in court. Both suits were heard together in the district court upon proofs taken.

The complainant, Rahilly, and other owners, on whose behalf he sues, held receipts in the following form:

> Lake City. Minn., ———, 1869.
> Warehouse of Geo. Atkinson & Co.
> Received in store, of P. H. Rahilly,
> ——— Bush. No. ——— wheat.
> (Signed)        Geo. Atkinson & Co.
> ———, per Atkinson.

*(marginal note: Not good unless counter-signed by Warehouseman.)*

The receipts issued by Atkinson & Kellogg were similar, with the addition of the words "subject to warehouse charges and advances," and an omission of the words "in store."

The proofs show that Atkinson & Kellogg were the owners of an elevator in Lake City. constructed in the usual manner, for the purpose of receiving, storing and discharging grain—the elevating machinery being propelled by steam. There are several similar buildings in the same city, and the proofs show that business in them is con-

ducted in the same general manner. The wheat is brought in by the farmers and is either purchased and paid for at the time by the proprietors of the elevators, or received by them and receipts issued therefor, like the one above copied. Wheat is classified or graded into what is termed "No. 1," "No. 2," and "rejected." Wheat when received in either mode is tested, graded, and put into a common bin, each grade being kept distinct, but all of the same grade is mingled together, and this is the invariable practice, and known to be so. The warehousemen do not keep the identical wheat on hand for which receipts are issued, but sell and ship at their pleasure; at least the evidence shows that this is the general practice. The receipts specify no time for the delivery of the wheat to the depositor, but the usage or custom is that the holder may select his own time for presenting them, and demand either the market price of the grain on that day, or the quantity and quality of the grain called for in the receipt. It is expected that the ticket-holder will give the warehouseman who issued it the first privilege of buying, if he will pay as much as the holder can obtain elsewhere. In the event the holder sells to the warehouseman, the latter receives no storage, unless the grain has been carried over the winter; but if he demands grain, or sells the receipt to others, who demand grain instead of the market price or value, then the practice is to charge storage. The evidence shows that it seldom happens that the depositor demands grain, but almost invariably elects to take the money, that is the highest market rate of the grade of grain mentioned in the receipt on the day when he closes the transaction and surrenders the instrument. The warehouseman often makes advances on these receipts, charging interest. The bankrupts, in addition to receiving wheat of farmers and issuing storage tickets as above, also purchased wheat for themselves under an arrangement with Eames & Co. of St. Paul, whereby the latter were to allow them a commission or compensation for their services, of two cents per bushel. Wheat thus purchased was paid for by the bankrupts' own checks on local banks, and the bankrupts reimbursed themselves by drafts drawn from time to time on Eames & Co. on account of wheat shipped to them. All wheat thus purchased was graded and put into its proper bin, mingled with wheat for which receipts or tickets were issued; and when shipments were made, the grain was taken from the amount in the elevator building. As wheat was being constantly received and constantly shipped, the amount in the elevator fluctuated from week to week. In the summer of 1870, before the new crop of that year came in, the bankrupts' elevator was entirely cleared of grain, although many of their receipts, issued in 1869, were then outstanding. The storage capacity of the bankrupts' warehouse was

about 60,000 bushels, although the amount of wheat which was received, handled and discharged therefrom in a year largely exceeded this amount. When they failed they had on hand 21,500 bushels of wheat, of which about 18,000 had been purchased within a week previous to the failure and mixed with grain then in the building. To pay for this 18,000 bushels, the bankrupts drew checks on their local bankers, Williamson & Co. and between the 15th and 17th of November, 1870, drew in favor of these bankers three drafts on Eames & Co. for $10,000, which were dishonored and returned to Williamson & Co. who demanded warehouse receipts as security, and on the 23d day of November, when it was known that the bankrupts had stopped business, and were in failing circumstances, the bankrupts issued two warehouse receipts for 12,000 bushels, which afterwards came into the hands of the First National Bank of St. Paul, as collateral security, with full notice of all the circumstances. The district court held that this transaction was an attempt on the part of Williamson & Co. to obtain from the bankrupts an illegal preference, contrary to the bankrupt act, and that the St. Paul bank was affected with notice thereof, and it accordingly dismissed the cross bill of the last named bank, but decreed that the ordinary receipt holders were entitled to the grain on hand at the time the petition in bankruptcy was filed. From the decree dismissing the cross bill, the St. Paul bank appeals, and from the decree on the original bill, the assignee in bankruptcy appeals.

E. C. Palmer and James Gilfillan, for assignee.

George L. Otis, for First Nat. Bank of St. Paul.

Bigelow, Flandrau & Clark, for complainant, Rahilly.

DILLON, Circuit Judge. The proofs satisfy me that the invariable and known course of business at the elevator warehouses in Lake City, was to mingle together all grain of the same grade, whether purchased outright and paid for at the time, or received on tickets specifying the grade and quantity and which contemplated the future delivery of the like amount of the same grade of wheat to the holders of such receipts when they should call for it, or the payment in money of the value of that amount and quality of grain. Those who deposited wheat must be taken to know, and in fact did know, that it would be thus mingled with other grain; that it would be shipped and sold by the warehousemen, when the latter should deem it to be for their interests (for such was the uniform practice), and consequently if the depositor should demand wheat instead of the value of the wheat, he would not receive, unless by accident, any of the identical wheat

deposited, nor any of the immediate mass into which it went. As wheat was being daily received and constantly shipped, the amount on hand fluctuated from time to time. In July, 1870, there was not a bushel of wheat in the elevator building, although many receipts for the crop of the previous year, or years, were outstanding. The proofs show that it was very unusual to deliver wheat to the depositor, as he almost always chose to take the value of the amount and quality called for in the receipt at the date when he desired to surrender it and close the transaction.

Under these circumstances the question is, what is the relation which exists between the grain depositor and the warehouseman? Is the depositor a bailor, simply, and the warehouseman a bailee, or is the former a seller, and the latter a purchaser, of the wheat? The district court held the former theory, and that the holders of outstanding receipts were entitled to the grain in the warehouse at the time of the failure of the bankrupts, and that as the amount therein did not equal the amount called for in the outstanding receipts. they must share pro rata. This view proceeds upon the ground that the title in the grain deposited does not pass to the warehouseman, but remains in the depositor, and that the latter has the title at all times to an amount of wheat in the warehouse equal to that called for in his receipt; and it is contended that if sales are made by the warehouseman, this is a conversion of the depositor's property, and if other like property is placed in the warehouse, the law will imply that it is placed there in substitution for that which was wrongfully removed, and hence that the grain at any time on hand belongs to the depositors to the extent of their receipts or tickets. It seems to me that this view cannot be maintained, and that it would lead to difficulties and confusion, and that it is against the established legal principles by which sales and bailments are discriminated. If this view is sound and the warehouse should burn without the fault of the owner, this would be a defence to any demand on the part of the ticket holder either for the wheat or its value—a proposition which cannot. I think, be maintained, and which is against the precise point adjudged in several well-considered cases. Chase v. Washburn (1853) 1 Ohio St. 244; South Australian Ins. Co. v. Randell (1869) L. R. 3 P. C. 101.

Viewed in the light of the uniform course of business, the contract is not one of bailment proper, but one (mutuum) where the property passes to the mutuary or receiver, and is delivered to him for his own use or consumption, and where he is not bound to return the identical article in its original or altered shape, but property of the same kind and value; in which case it is a sale, and the title passes, and the receiver becomes a debtor for the stipulated return. Jones,

Bailm. 64, 102; Story, Bailm. § 439; 2 Kent, Comm. 590.

That this is a correct view of the relations between the wheat depositors and the bankrupts is expressly adjudged in the following cases, which, in their facts, are identical with the one under consideration. South Australian Ins. Co. v. Randell, supra; Chase v. Washburn, supra; Lonergan v. Stewart (1870) 55 Ill. 44; Johnston v. Browne, infra. See Myers v. Adams [Case No. 62]; Stearns v. Raymond, 26 Wis. 74.

Applying the principle above mentioned, the privy council in the Case of South Australian Insurance Company, in an elaborate judgment, decided, where corn was deposited by farmers with a miller to be "stored," and used as part of the current or consumable stock or capital of the miller's business, and was by him mixed with other corn deposited for a like purpose, subject to the right of the farmers to claim at any time, an equal quantity of corn of the like quality, without reference to any specific bulk from which it is to be taken, or in lieu thereof, the market price on any equal quantity, on the day on which he made his demand, with a small charge for general purposes, that the transaction was a sale by the farmer to the miller of the corn deposited, and not a bailment. In giving their lordships' judgment, Sir Joseph Napier says: "It appears to their lordships that there is no sound distinction, in principle, between this, and the case of money deposited with a banker on a deposit receipt; * * * that it is not the case of a possession given (by the farmer) subject to a trust, but that it is the case of property transferred for value, at the time of delivery, upon special terms of settlement. L. R. 3 P. C. 109, 311.

And so the supreme court of Iowa, in Johnston v. Browne (1873) 37 Iowa, 200, has also held. In the case just cited, wheat was left in an elevator with the understanding that when the depositor should be ready to sell it, the proprietor of the elevator would give the highest market price or the same amount of wheat of like grade and quality—the custom being to ship off grain, but to keep on hand sufficient to fill outstanding storage receipts, but not the identical wheat received —and it was adjudged that the transaction was a sale and not a bailment.

I regard the case at bar distinguishable from Young v. Miles, 20 Wis. 615, 23 Wis. 643, and Kimberly v. Patchin, 19 N. Y. 330, and like cases, where the bulk from which the mingled articles were to be taken was specific and not subject to constant fluctuations.

I am of opinion, therefore, that the court erred in holding that the receipt owners had the right to the wheat in the warehouse as against the assignee, and its decree in this respect is reversed, and a decree will be entered here dismissing the bill.

I may add, that I am entirely satisfied, in

the light of the mode of conducting business at the grain elevators, as shown in the testimony, that the foregoing is a sound view of the relation between the grain depositor and the proprietor of the elevator, and that legislation to protect the former against the insolvency of the latter would appear to be called for.

In respect to the claim of the bank upon the two wheat receipts for 12,000 bushels, made by the bankrupts after their failure, to secure $10,000 to their local bankers, I concur so fully in the views of Judge Nelson that I do not deem it essential to do more than refer to his opinion. The decree of the district court, dismissing the cross-bill of the bank is affirmed. The cause will be remanded to the district court with directions to tax the costs in that court equitably as between the receipt holders and the bank. The costs on this appeal will be borne equally between the same parties. Decree accordingly.

[NOTE. In Chase v. Washburn, 1 Ohio St. 244, the receipt of the warehouseman, was: "Milan, O. Nov. 5th, 1847. Received in store from J. C. W. thirty bushels of wheat. H. Chase & Co." The evidence aliunde showing that the wheat was received with an understanding that the warehouseman might dispose of it, and that, upon demand, he would return other grain, or pay for that deposited, the transaction was adjudged a sale and not a bailment, and therefore it was no defense to the warehouseman that his warehouse was destroyed by fire at a time when it contained wheat enough to answer all his outstanding receipts.

So, in the case of South Australian Ins. Co. v. Randell, L. R. 3 P. C. 101, 6 Moore. P. C. (N. S.) 341, as in the case to which this note is subjoined, the receipts issued to the farmers by the miller were "to store," and, under the circumstances stated in the foregoing opinion, the transaction was considered to be a sale.

In 6 Am. Law Rev. 450 [Chase v. Washburn, 1 Ohio St. 244], the reader will find a valuable article entitled "Grain Elevators; the Title to Grain in Public Warehouses." The case Chase v. Washburn is selected "as presenting the ablest exposition of the opposite opinion" to that which the annotator there maintains to be the true doctrine. In that note is cited, perhaps, every reported case on the subject of the title to grain in elevators which had been decided down to April, 1872. The substance of that note will be found condensed in Holmes' edition of Kent's Commentaries. 2 Kent, Comm. (12th Ed.) 590.

The case of Rahilly is one where there was an understanding implied from the known and invariable course of business, that the warehouseman might mingle the specific wheat deposited with other wheat of like quality, and dispose of it at his pleasure, with the further understanding that on demand, he would pay the depositor the highest market price, or deliver the same amount of grain of a like quality, but not the identical grain deposited, nor grain from any specific mass. We have found no adjudged case which holds such a transaction to be a bailment, but there are several directly to the point that it is a sale. Such a case is obviously distinguishable from that of a specific deposit which is not to be changed by the warehouseman, but retained by him until called for by the depositor. This is a bailment. And the case is distinguishable, also, from those where specified amounts of grain of different owners is mixed by consent in specific mass, without any understanding that the warehouseman might dispose of the grain so deposited and mingled. And it may be different from the case where the proprietor of the elevator is a mere warehouseman and where his course of business is, and his duty is, always to keep on hand in the elevator sufficient grain to meet all outstanding receipts, though not the particular grain received. We say it may be different from such a case, but it is doubtful whether it is so. See Johnston v. Browne (1873) 37 Iowa, 200. But where it is known by the depositor that the warehouseman is himself buying and selling grain on his own account, and also receiving grain "in store," and that he intermingles all that is so obtained, and is constantly buying, receiving and selling, so that the mass is continually fluctuating, and there is no fixed time when the receipts are to be presented, it seems impossible to consider the holders of the outstanding receipts as tenants in common of the whole mass of wheat in the elevator in proportion to the amount of their receipts. And such a case seems to be the same in principle as an ordinary general deposit of money in a bank; it creates simply the relation of debtor and creditor; and so the privy council in the Case of Australian Insurance Company, above cited, considered it.

The very recent case of Butterfield v. Lathrop, 71 Pa. St. 225, goes upon the same principle. Here, Baxter and numerous other farmers delivered milk to a cheese factory: each was credited with the amount of his milk, and all was manufactured together; the company sold all the cheese; each farmer was charged with the expense, and received his share of the proceeds in proportion to the milk furnished; Baxter's interest in the cheese, etc. was sold under an execution against him: Held, that the sale by the factory converted his interest into a money demand, and this interest was, therefore, not the subject of a levy.' The arrangement at the factory did not constitute the farmers partners nor tenants in common in the cheese; nor was there an agency or bailment as to the particular milk delivered. It was a sale of milk to be paid for in a certain time and manner.

On the general subject see and compare Cushing v. Breed, 14 Allen, 376; Warren v. Milliken, 57 Me. 97; Dole v. Olmstead, 36 Ill. 150; 2 Kent, Comm. (12th Ed.) 590, and cases cited in Mr. Holmes' note. The decision in Rahilly's case was acquiesced in. See Hamilton v. National Loan Bank [Case No. 5,987].