Schindler *et al. v.* Westover *et al.*

Filed March 12, 1885.

———◆———

No. 11,600.

SCHINDLER ET AL. *v.* WESTOVER ET AL.

PRACTICE.—*Special Finding.—Conclusions of Law.—Exceptions.*—Where the court, at the request of one or more of the parties, makes a special finding of the facts and states thereon its conclusions of law, and the party objecting thereto merely saves an exception to the conclusions of law, and does not move either for a new trial or for a *venire de novo*, on appeal he admits that the facts are fully and correctly found, and the error, if any, is predicated solely upon the court's application of the law to the facts so found.

Schindler *et al. v.* Westover *et al.*

BAILMENT.— *Mutuum or Exchange.— Sale.— Warehouseman.— Mingling of Grain.—Tenants in Common.—Ownership.—Demand.—Conversion.*—In November, 1882, one K., a miller and warehouseman, received of W. five hundred bushels of wheat, and agreed verbally to store such wheat until July 1st, 1883 ; that before that date W. might sell the wheat when he pleased, or that wheat would be returned if called for. The wheat was mingled with other wheat purchased by K., in his flouring-mill, which ground, when running, about two hundred bushels of wheat per day, and thereafter, until March 3d, 1883, ran about one-half of the time. In February, 1883, W. received from K. a writing, in evidence of the aforesaid verbal contract. On March 3d, 1883, K. ceased to run the mill, and, between that date and July 1st, 1883, he executed to the defendant S. and others a chattel mortgage on all the wheat in the mill, amounting at the time to nineteen hundred bushels. On June 30th, 1883, W. demanded of K. the wheat or the money on his contract, but received neither; and, on July 3d, 1883, W. demanded of the defendants S. *et al.*, while they were removing the wheat from the mill, that they should leave five hundred bushels thereof in the mill for him, which they refused to do, and afterwards converted all the wheat, and the proceeds thereof, to their own use.

*Held,* upon the foregoing facts, that the contract of K. with W., verbal or written, was not a *mutuum* or exchange, nor a sale of the wheat, but that it was a contract of bailment, pure and simple.

*Held,* also, that, under such contract, K. and W. became and were tenants in common of the nineteen hundred bushels of wheat, remaining in the mill, W. to the extent of his five hundred bushels, and K. as to the residue ; and that K. could not sell or mortgage W.'s wheat to the defendants, so as to divest the plaintiff's title thereto, or to authorize its removal from the mill, after W.'s demand that it should be left there.

*Held,* also, that when, after such demand, the defendants removed the wheat from the mill and converted the same to their own use, they became and were liable in damages to the plaintiff, as the owner of the wheat so converted, for its fair value.

From the St. Joseph Circuit Court.

*A. Anderson,* for appellants.

*L. Hubbard* and *J. Dixon,* for appellees.

HOWK, J.—After this cause was at issue it was tried by the court, and, at the request of the parties, the court made a special finding of facts, and stated its conclusions of law thereon, in substance, as follows :

"About the first day of November, 1882, the plaintiffs

agreed with George Kuhn to put in store with him 500 bushels of wheat in Kuhn's flouring mill at Mishawaka. It was agreed that said wheat should be stored to July 1st, 1883, that plaintiffs might sell the wheat when they pleased before that date, or that wheat would be returned if called for. George Kuhn was then operating a flouring mill, which ground, when running, about 200 bushels of wheat per day, and thereafter, until March 3d, 1883, ran about one-half of the time. At the time of the negotiation, in October or November, 1882, plaintiffs asked George Kuhn to keep their wheat in a bin by itself, and Kuhn replied that he could not agree to return them the same wheat; that he did not intend the wheat to go out of the mill. The wheat, 516 bushels, was delivered by plaintiffs to George Kuhn and piled on the floor of the mill early in November, 1882, when the mill was not running, and for that reason could not be elevated into the bins where wheat was usually kept. In the same pile on the floor was put 200 or 300 bushels bought by George Kuhn of other parties, and in a few days the mill was started and the wheat was elevated into the bins in which wheat was kept and from which the grinding was done. Of the wheat mentioned in said contract, and that piled with it, all except about 200 or 300 bushels, was put in a bin known as the smutting bin, and was all made into flour and disposed of by George Kuhn before March 3d, 1883, the remaining 200 or 300 bushels were put into another bin, known as the corner bin, and was all ground and disposed of by George Kuhn before March 3d, 1883. Said wheat was mingled with other wheat in said two bins, and all the bins in which wheat was stored ran into the bin known as the smutting bin. George Kuhn bought at least 4,000 or 5,000 bushels of wheat after this before March 3d, 1883, which went into the mill. Wheat was continually taken in, ground and sold, and on March 3d, 1883, none of the identical wheat so delivered by plaintiffs was in the mill. On March 3d, 1883, there was left in the mill about 1,900 bushels. On the 21st day of February, A.

D. 1883, the plaintiff received from John Kuhn, a son of George Kuhn, who was then running the mill during the sickness of his father, as his agent, a writing in the words and figures following :

"' MISHAWAKA, February 21st, 1883.

' Received of R. M. Westover (500) five hundred bushels of wheat in store to July 1st, 1883, to be disposed of at market price when he concludes to dispose of same between above date and July 1st, 1883, or wheat returned if called for.

"' GEORGE KUHN,
"' per JOHN."

in evidence of the contract theretofore made. Sixteen bushels of the 516 were sold to George Kuhn by plaintiffs, and paid for by George Kuhn. The remaining 500 bushels mentioned in the writing were never sold by plaintiffs, nor did they receive any payment therefor.

" On the 3d day of March, A. D. 1883, the mill stopped running and was not thereafter run until after July 3d, 1883, and between March 3d, 1883, and July 1st, 1883, the defendants, Schindler, Kamm, Yenn and Casper Kuhn, received of George Kuhn a chattel mortgage on all the wheat in the mill, and under and by virtue of said chattel mortgage took and sold all the wheat in the mill, amounting at that time to nineteen hundred bushels, receiving therefor ninety-five cents per bushel at the depot. The wheat was worth, in June and July, 1883, ninety-three cents per bushel at the mill.

" On the last day of June, 1883, plaintiffs demanded of George Kuhn the wheat or money on his agreement, but received neither, and on the 3d day of July, A. D. 1883, they demanded of the defendants, John J. Schindler, Simon Yenn, Casper Kuhn and Adolph Kamm, that they should leave five hundred bushels of wheat for them in the mill, but said defendants refused so to do. They were then removing the wheat from the mill, and about that time they converted all the wheat and the proceeds thereof to their own use.

" The value of the wheat when sold was ninety-three cents

per bushel, and the value of five hundred bushels was at that time four hundred and sixty-five dollars.

"And as a conclusion of law thereon, I find that the plaintiffs are entitled to recover of the defendants, John J. Schindler, Adolph Kamm, Simon Yenn and Casper Kuhn, the sum of four hundred and sixty-five dollars.

(Signed) "DANIEL NOYES."

" January 16th, 1884."

Over the appellants' exceptions to the conclusion of law the court rendered judgment in accordance therewith for the appellees, the plaintiffs below.

In this court the only error assigned by the appellants is that upon the facts specially found the trial court erred in its conclusion of law.

As the case is presented here the appellants admit that the facts have been fully and correctly found by the circuit court, and therefore the only question we are required to consider and decide may be thus stated: Upon the facts specially found, did the court err in its conclusion of law? This is settled by many decisions of this court. *Cruzan* v. *Smith*, 41 Ind. 288; *Robinson* v. *Snyder*, 74 Ind. 110; *Braden* v. *Graves*, 85 Ind. 92; *Dodge* v. *Pope*, 93 Ind. 480; *Fairbanks* v. *Meyers*, 98 Ind. 92.

Upon the facts specially found the appellees claim, and the court so decided, that the agreement or contract, under which they delivered and deposited their wheat at and in the mill of George Kuhn, was one of bailment, pure and simple. If this view of the force and legal effect of such agreement or contract be the correct one, it would seem that the court did not err in its conclusion of law, and that the judgment ought to be affirmed.

But, on the other hand, the appellants insist that such agreement or contract is not one of bailment, but is a *mutuum* or exchange or sale of the wheat, under which the title thereto passed at once to the depositary, George Kuhn, and he became the appellees' debtor for the value of the wheat. If this

view of the case be correct, of course the court erred in its conclusion of law, and the judgment should be reversed.

The question is a close one, and much can be said, indeed, much has been said by the learned counsel of both the appellees and the appellants in their able and exhaustive briefs of this cause, in support of their respective positions. The views of both parties, antagonistic and irreconcilable as they are, are not unsupported by authority. A careful consideration of the facts found by the court in the case in hand has led us to the conclusion, though with some degree of hesitancy, that the contract or agreement, under which the appellees deposited their wheat in the mill of George Kuhn, was a contract of bailment. Upon the facts specially found there was not, and could not have been, a *mutuum* or exchange, or sale of the wheat; for the court found that the wheat was put in store with George Kuhn in his flouring-mill, about the 1st day of November, 1882, under the following verbal agreement, then made: " It was agreed that the wheat should be stored to July 1st, 1883; that the plaintiffs might sell the wheat when they pleased before that date, or that wheat would be returned if called for." The court also found that, on the 21st day of February, 1883, the contract or agreement theretofore made was reduced to writing, in the form of a receipt executed to the appellees for the wheat, in the name of George Kuhn, by his son, a copy of which writing is heretofore given in this opinion. It will be observed that there is no substantial or material difference between the terms of the verbal agreement and those of the written contract. It is manifest from the express terms of the contract or agreement, verbal or written, that the appellees did not sell their wheat, and the title thereto did not pass, to the depositary, George Kuhn; for it was plainly stipulated that the appellees might sell the wheat when they chose, before July 1st, 1883, or wheat would be returned to them, if called for.

We are of opinion that the contract or agreement, verbal or written, between the appellees and the depositary, Kuhn,

was a contract of bailment. In *Ledyard* v. *Hibbard*, 48 Mich. 421 (42 Am. R. 474), a firm of merchant millers received wheat from farmers and stored it in the mill elevators, giving receipts for it in the following form:

"GRAND RAPIDS, MICH., March 26, 1878.

"Received of William B. Ledyard by L. Byrne 820 bushels number One wheat at owner's risk ·from elements, at 10 cents less Detroit quotations for same grade when sold to us. Stored for —— days."

(Signed) "HIBBARD & GRAFF."

Nothing was charged for storage, but the millers used the wheat as they needed it in their manufacture of flour, and its identity was constantly changing in the elevators. It was held by the Supreme Court of Michigan, that in the absence of local usage to the contrary, or of a course of dealing between the parties by which a different effect should be given them, the receipts should be construed as evidence of a bailment, instead of a sale. Speaking for the court, COOLEY, J., said:

"The fact that the receiptors for the wheat transacted business in the two capacities of warehousemen and millers, would not be of importance, and certainly could not affect the construction of their business contracts. If as warehousemen they gave warehouse receipts for grain received in store, the receipts must be construed by their terms and by commercial usage; in commercial circles they would be understood to represent the title to the quantity of grain specified; and though the quantity in store might fluctuate from day to day as grain would be received and delivered out, this would not affect the title of the holder of receipts, who would be at liberty to demand and receive his proper quantity at any time, if so much remained in store. But if the quantity in store is reduced by consumption, instead of by shipment or sale, it is not apparent that the rights of the holder of the receipts should be any different."

The principal difference between the case last cited, and

from which we have so liberally quoted, and the case in hand, is that the former case was an action of replevin brought, and successfully maintained, by the depositor of the wheat against the depositary for the same quantity of wheat, although the identical wheat deposited had been probably consumed by the depositary in the manufacture of flour; while, in this case, the depositor has sued the assignees or mortgagees of the depositary for the wrongful conversion of his wheat. This difference is not a material one, we think, upon the facts specially found by the court in this case. For the court specially found, that on the last day of June, 1883, and within the time specified in the contract, the appellees demanded of the depositary, George Kuhn, the return of the wheat or the money therefor, and received neither. There was then wheat in the mill of George Kuhn, more than sufficient to have enabled him to comply with appellees' demand, in accordance with their contract, upon which wheat, however, the said George Kuhn had theretofore executed a chattel mortgage to the appellants. It was further found by the court, that on the 3d day of July, 1883, the appellees demanded of the appellants, when the latter were engaged in the removal of the wheat from George Kuhn's mill, that they should leave five hundred bushels of wheat in the mill for the appellees; but this the appellants refused to do, " and, about that time, they converted all the wheat and the proceeds thereof to their own use."

Now it is absolutely certain, we think, that under the contract or agreement, verbal or written, of George Kuhn with the appellees, their title to five hundred bushels of wheat in the mill was superior, both in law and equity, to any claim thereon of George Kuhn, the depositary, although the identical wheat, stored or deposited in the mill by appellees, might have been previously consumed by him in the manufacture of flour. This is the logical and legal effect of the agreement or contract, verbal or written, between George Kuhn and the appellees; whenever, prior to July 1st, 1883, the ap-

pellees demanded of George Kuhn the return to them of the five hundred bushels of wheat (so much being then in store), their title thereto was absolute and perfect as against Kuhn, or those claiming under him. If such return were refused, they could maintain replevin for the possession of the wheat, or if, after the demand for the return of the wheat, the parties in possession should convert the same to their own use, the appellees could maintain an action for the recovery of damages, for such wrongful conversion of the wheat. This latter case is the case at bar.

In *Sexton* v. *Graham,* 53 Iowa, 181, a case similar in some of its features to the case under consideration, it was held by the Supreme Court of Iowa that where grain was delivered to a warehouseman and a receipt taken, which provided that the grain might be stored in a common mass with other grain of the same quality, the contract was one of bailment and not of sale, although the warehouseman was himself continually buying and adding grain on his own account to the common mass, and shipping away therefrom.

Upon the facts specially found by the court, the appellants could not and did not, by virtue of their chattel mortgage, acquire any better title to the wheat mortgaged than the mortgagor George Kuhn had thereto at the time the return thereof was demanded by the appellees. If the return of the wheat had been demanded of and refused by George Kuhn, at or before the time he mortgaged the same to the appellants, and when he had 1,900 bushels of wheat in his mill, it can not be doubted, we think, that the appellees might have maintained an action against him for the recovery of their wheat in quantity, whether the identical wheat deposited by them remained in his mill or not. They and he became and were tenants in common of the 1,900 bushels of wheat then in his mill; they to the extent of their 500 bushels and he to the residue. He could not sell nor mortgage their quantity of the wheat to the appellants, so as to divest the appellees' title thereto, or to authorize its removal from the mill, after

their demand that it should be left there by such mortgagees. When, after such demand, the appellants removed the wheat from the mill and converted the same to their own use, as the court found the facts to be, they became and were liable in damages to the appellees, as the owners of the 500 bushels of wheat so converted, for the fair value thereof. 2 Kent Com. 364, 365; *Cushing* v. *Breed,* 14 Allen (Mass.) 376; *Young* v. *Miles,* 20 Wis. 615; *Young* v. *Miles,* 23 Wis. 643; *Pribble* v. *Kent,* 10 Ind. 325; *Rice* v. *Nixon,* 97 Ind. 97; *Bottenberg* v. *Nixon,* 97 Ind. 106.

We are of opinion, therefore, that upon the facts specially found, the trial court did not err in its conclusion of law.

The judgment is affirmed, with costs.

