## THE PIETRO G.[1]

### SCHIAFFINO v. TWO HUNDRED AND THREE THOUSAND THREE HUNDRED AND NINETY-TWO KILOGRAMMES OF SCRAP-IRON.

### SCHULZ v. THE PIETRO G.

*(District Court, S. D. New York.  March 6, 1889.)*

1. SHIPPING—CARRIAGE OF GOODS—BILL OF LADING—SHORTAGE.
    When the bill of lading states "weight unknown," in the absence of proof of the weight shipped on a vessel, other than the recitals of the bill of lading, and a weighmaster's certificate, the vessel cannot be held for shortage.
2. SAME—SEPARATE CONSIGNMENTS—DUTY OF MASTER.
    A vessel shipped two consignments of scrap-iron; the master apprehended shortage in weight, but did not keep the lots distinct; and, discharging in the inverse order of receiving, delivered first to one consignee his exact weight, leaving a large shortage to fall on the other    *Held*, that it was the master's duty to have kept the lots separate, or else to take security before delivering the whole weight to the first consignee, that he would make good his proportion of any deficiency in the whole bulk; and that the ship was liable, as for a misdelivery, in delivering to the first consignee more than his proportion of the whole weight shipped.
3. DEMURRAGE—BILL OF LADING—MISTAKE OF CARGO-OWNER.
    A vessel's bill of lading provided that her cargo should be discharged "as fast as the ship could deliver," and the cargo-owner fixed too early a day for her arrival at a substituted place of delivery, whereby the vessel was detained on arriving at the wharf.    *Held*, that the cargo-owner was liable for demurrage.

In Admiralty.   Libel to recover demurrage for detention in discharging scrap-iron.    Cross-libel for shortage in the delivery of the iron.

*Wing, Shoudy & Putnam*, for Schulz.

*De Ullo*, for the Pietro G.

BROWN, J.    The Italian bark Pietro G. arrived at this port from Antwerp on the 23d April, having on board two lots of scrap-iron, one of about 500 tons, and the other of about 200 tons, with empty barrels on top.    She went to Atlantic Basin to discharge, where the precise

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

amount of the larger lot of scrap-iron was weighed out and delivered to the consignee of that lot. Schulz & Co., the owners of the smaller lot, had sold their lot to be delivered on cars at the Erie Railroad dock, Jersey City, and therefore made a further contract with the bark to go there and deliver it on the cars, which she accordingly did. She reached the wharf on the 16th of May; but, another vessel being at the time unloading at the crane, by which the cargo was usually put into the cars. the bark was unable to commence unloading until the 26th. She claims 10 days' demurrage for this delay. On completing discharge at the Erie dock the last lot was found short 35 tons, 15 cwt., then worth, at the market rate, $751, to recover which the cross-libel was filed.

1. *As to shortage.* There is no evidence of the weight of either of the lots of scrap-iron loaded at Antwerp, aside from the recitals in the bills of lading, except a weighmaster's certificate, which is not of itself legal evidence. Upon each of the bills of lading the master, before signing, wrote: "I do not know the weight or quality." In the absence of further proof of the weight put on board at Antwerp, the vessel cannot be held simply for shortage. *Eaton* v. *Neumark,* 33 Fed. Rep. 891, and cases there cited; affirmed, 37 Fed. Rep. 375.

A further question arises upon the ship's mode of delivering the cargo, and whether the whole shortage of 35 tons can be thrown upon the libelant's small lot of 200 tons, delivered last. I think not, under the proofs in this case. The master took no part in the weighing. He had some doubt as to the amount of the weight received, and for that reason, before signing the bills of lading, wrote in the precautionary clause. The two bills of lading show shipments by different shippers. Even had the two lots been shipped by the same shipper, it would ordinarily be the master's duty to keep the lots separate, so as to deliver to each consignee his own lot. There is no evidence to show that the shortage occurred in one lot rather than in the other; and it is more probable that the shortage arose through some incorrect mode of weighing, or mistakes in keeping tally, applicable to both lots alike, than that so great an error should be made in a lot of 200 tons only. *Manning* v. *Hoover,* Abb. Adm. 188; *The W. A. Morrell,* 27 Fed. Rep. 570.

With cargoes of scrap-iron, it is said not to be necessary to deliver the identical iron, because there is no difference in the market value of different lots. The dates of the bills of lading make it probable that the larger lot was delivered first, and put in the bottom of the ship, and the smaller lot on the top of it, whether both bills of lading were signed after all was loaded, or not. There is no evidence that any separation of the lots was made. Had there been, it could not have failed to be discovered on the discharge of the first 500 tons, and would scarcely have failed to be mentioned in the evidence. But nothing is said about any such separation, and the inference is that none was made. No complaint is, however, made by Schulz & Co. because their iron was to be taken from the bottom, instead of the top. If this practice as respects scrap-iron has been so far adopted as to constitute an exception to the general duty to keep different lots distinct, it certainly would not author-

ize, in a case of doubt about the weight, the whole shortage to be thrown upon what was discharged last. Under such a practice both consignees would be deemed to consent that the whole be treated as one mass, like grain shipped in bulk; and when there is nothing to show that the shortage arose in one lot rather than in the other, the equitable rule applies that apportions the loss among the different owners *pro rata.* Story, Bailm. § 40; *The Idaho,* 93 U. S. 585, 586; *Dows* v. *Ekstrone,* 3 Fed. Rep. 19; *Rahilly* v. *Wilson,* 3 Dill. 420, 426; *Adams* v. *Meyers,* 1 Sawy. 308. And where the master has reason to believe that the weight is short of that stated in the bills of lading, it is negligence to keep no separation, to invert the order of delivery, and to deliver the whole exact weight stated in the bill of lading for the first lot, and take no precaution for the last. The same prudence and care that induced the master to insert in the bills of lading the protective clause for his ship, required him to take care that the apprehended shortage, if any, should be properly apportioned. It was not consistent to insert in the bill of lading for the larger lot the statement that he did not know, and in effect, was not responsible for, its weight, and then, on arrival, proceed to weigh out and deliver to the consignees its exact weight, without taking any security that the consignee's proportion should be returned or accounted for in case a final shortage was found. Should such security be refused by the first consignee, the master would; I think, not only be justified, but be bound, to withhold absolute delivery either of the whole lot, or of a sufficient amount to cover any apprehended shortage. As the ship neither kept the lots separate, nor took any precaution towards a right delivery to the libelants of their share of the whole, she should be held liable as for negligence in delivering to the other consignee an excess over his rightful share, and a deficiency to the libelants. In effect, it is a case of misdelivery of a part of the cargo, for which the ship is responsible. *Railroad Co.* v. *Bank,* 123 U. S. 727, 8 Sup. Ct. Rep. 266; *The Drew,* 15 Fed. Rep. 829. The whole shortage, at the market rates, amounts to $751. The proportion which should have been withheld or charged against the larger lot is $536; and for that sum, with interest, the ship must stand charged in favor of the libelants.

2. *Demurrage.* The bill of lading for this lot provided that the cargo should be discharged "as fast as the ship could deliver." The substituted place of delivery at Erie Railroad wharf was evidently intended to be subject to the same provision. The mistake on the part of Schulz & Co. was in fixing too early a day for the expected arrival of the bark at the Erie wharf, and for having set the day, in their arrangement with the proprietors of the dock, without consultation with the master of the bark. The contract admitted by the pleadings was that she was to deliver into the cars, and that could only be done at the crane. She had no right, therefore, to discharge elsewhere upon the dock, and had to wait until the 26th. The defense set up in the answer is that proper application was not made by the master to the proprietor of the dock for cars; but this defense is not sustained by the evidence. The evidence shows no fault on the ship's part, as respects notice of the de-

lay, or endeavors to get a speedy berth. Deducting one Sunday, there remain nine days, for which demurrage should be allowed. If the amount is not agreed on, it may be ascertained by a reference. The libelants and the cross-libelants are each entitled to decrees accordingly upon their respective claims.